IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MELODY GRIFFITH,

        Plaintiff,

vs.                                                                                    No. CIV 08-838 LFG

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

MEMORANDUM OPINION AND ORDER

      **THIS MATTER** is before the Court on Plaintiff Melody D. Griffith's ("Griffith") Motion to Reverse and Remand for Rehearing, With Supporting Memorandum, filed February 13, 2009. [Doc. 15.]  The Commissioner of Social Security issued a final decision denying benefits, finding that Griffith was not disabled and not entitled to Supplemental Security Income ("SSI") benefits or disability insurance benefits ("DIB").  The Commissioner filed a response to Lucero's Motion [Doc. 16], and Griffith filed a reply [Doc. 17].  Having considered the pleadings submitted by the parties, the administrative record and the applicable law, the Court grants Griffith's motion and remands for additional administrative proceedings as discussed below.

I.     **PROCEDURAL RECORD**

      On December 30, 2005, Griffith applied for SSI and DIB [RP 15, 70, 280], alleging she was disabled from August 15, 2005 [RP 77], due to "severe sciatic nerve" [problems or pain]. [RP 76.] Griffith claims, at times, that a motor vehicle accident on August 15, 2005 prevented her from being able to work, stand or walk too long. [RP 76-77.]  Griffith's  application was denied at the initial and

reconsideration levels. [RP 59, 275.]  On November 27, 2007, the ALJ conducted an administrative hearing in Farmington, New Mexico, at which Griffith was represented by counsel. [RP 301, 303.] On February 20, 2008, the ALJ issued a decision finding Griffith not disabled. [RP 15-22.] Thereafter, Griffith filed a request for review.  On August 22, 2008, the Appeals Council denied Griffith's request for review and upheld the final decision of the ALJ. [RP 5-9.]  On September 15, 2008, Griffith filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Griffith was born on January 15, 1956, and was 51 years old at the time of the ALJ hearing. [RP 70, 304] On one disability form, Griffith wrote that she completed only the 11th grade in high school in 1974 [RP 80].  At the administrative hearing, Griffith testified she graduated from high school and received some in-house training as a phlebotomist.  [RP 304.] Griffith worked as a phlebotomist and drug screener for about eleven years. [RP 77, 304.] Her work history and earnings record are erratic or incomplete. [RP 64.]

Griffith has one child. [RP 71.]  One disability application form indicates that Griffith was widowed. [RP 71.]  On another benefit application form, Griffith stated she was never married. [RP 280.]  At the administrative hearing, she testified she was divorced. [RP 304.]  There are other inconsistencies in the record, including the cause or date of Griffith's alleged disability.  The Court discusses those inconsistencies in its review of the medical record.

## II.   STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1]  The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .;"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, she is capable of performing other work.[8]

At step five, the ALJ can meet his burden of proof in two ways: by relying on a vocational expert's testimony or by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

the claimant can perform other jobs in the economy.  Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

In this case, the ALJ utilized testimony from a vocational expert and made his determination of non-disability at step five of the analysis. [RP 21.] The Court observes that the ALJ, in possibly a boilerplate recitation of the five-step sequential process, inaccurately stated that at step five, the "claimant generally continues to have the burden of proving disability at this step," although "a limited burden of going forward with the evidence shifts to the Social Security Administration." [RP 17.] This is incorrect.

The Tenth Circuit Court of Appeals explained that if the claimant establishes at step four that she cannot return to her past relevant work, the burden of proof shifts to the Commissioner at step five to show she retains the RFC to perform work in the national economy, given her age, education and work experience.  Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005).  In an unpublished opinion, the Tenth Circuit further stated that "[t]he claimant has no burden on step five."  Stewart v. Shalala, 999 F.2d 548, at *1 (Table, Text in Westlaw) (10th Cir. Jun. 28, 1993) (citing Thompson v. Sullivan, 987 F.2d 1482, 1491 (10th Cir. 1993)).  Thus, in accordance with pertinent legal standards, the ALJ should revise his summary of the five-step process, and clarify that the burden of proof at step five is on the Commissioner.

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v.

---

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards.  Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied.  Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After considering the evidence, the ALJ denied Griffith's request for benefits. [RP 17-22.] The ALJ determined, in part, that Griffith had not been engaged in substantial gainful activity since August 15, 2005; had a severe impairment of degenerative disc disease of the lumbar spine at L4-5 and L5-S1 with herniation and sciatica, but that none of Griffith's impairments or combination of impairments met listing criteria; had the residual functional capacity to lift and carry 10 pounds frequently, 20 pounds occasionally; could stand, sit or walk for six hours, was able to push and pull, could engage in a full range of postural movements occasionally, with the exception of never climbing ropes, ladders or scaffolds; and could manipulate, see and communicate without restriction and work within any environment. [RP 17-18.]

The ALJ further determined that Griffith could not perform any of her past relevant work, including phlebotomy or drug screening.  She was defined as a younger individual with a limited education.  Transferability of job skills for Griffith was not material to the determination of disability because using the grids as a framework supported a finding that she was not disabled, whether or not she had transferable job skills.  After considering Griffith's age, education, work experience and RFC, the ALJ concluded that jobs existed in significant numbers in the national economy that she could perform, including employment as a courier, parking lot attendant, and a shipping and receiving clerk. [RP 20-21.] As noted previously, the ALJ relied on the testimony of a vocational expert in reaching his findings, which the ALJ concluded were consistent with the Dictionary of Occupational Titles. [RP 21.]

IV.   **MEDICAL AND WORK HISTORY**

Griffith completed high school and received some in-house training as a phlebotomist, or she may have completed only the eleventh grade of high school. [RP 80, 304.] From about 1990 to 2003, Griffith stated that she worked as a phlebotomist or drug screener. [RP 82.] For a month in

6

2004, Griffith worked as an auditor.  [RP 82.] Her earning records indicate that she worked steadily from 1991 through 1999. [RP 64.] In 2000, it is unexplained why she earned only $2300.  There are no earnings reported for 2001.  In 2002 and 2003, Griffith earned between $6,000 and $8,400.  In 2004, no significant wages were reported, but in 2005, Griffith earned over $10,000.  In 2006, she earned over $7,000. [RP 64, 66.]

Griffith provides varying dates and reasons as to when she had to stop working.  In her disability report, she reported she stopped working on January 31, 2004. [RP 77.] However, she alleged at times that the cause of her alleged disability was an August 15, 2005 motor vehicle accident. [RP 76-77.] She apparently was self-employed in 2006. [RP 66.] Griffith stated that she became unemployed in 2004 "as [she] worked for the tax." [RP 77.]

On a December 2005 disability form, Griffith stated that she was unable to get a job and that her son was suddenly cut off SSI even though he was still disabled. [RP 94.] On that same form, Griffith wrote that she was prescribed a cane when she hurt her back. [RP 96.]  She further explained that she needed help to sue the company that caused her fall and injuries. [RP 97.]

In another disability form, filled out May 8, 2006, Griffith stated she had been cut off Medicaid and was waiting until November 1, 2006 to receive Medicaid assistance again.  She then planned to follow up with treatment by a neurosurgeon for a "damaged sciatic nerve with [a] cyst growing on it." [RP 133.]

A September 12, 2005 medical record indicates that Griffith sought medical care because she had fallen on September 8, 2005 at a casino and injured her lower back. [RP 139.] On January 16, 2006, Dr. Marc Flitter, a neurologist, examined Griffith, who he described as having "slipped leaving a restaurant on January 20, 2005" and since then had experienced "back pain radiating into the right lower extremity." [RP 142.] Dr. Flitter noted that a November 2005 MRI showed a

synovial[10] cyst to the right side at L4-5, associated with a herniated disk and anterior subluxation[11] of L4 and L5. [RP 142.]

On June 12, 2006, Griffith was examined by Dr. William Barkman at the request of disability services. She reported to Dr. Barkman that her lower back pain and radiating pain and numbness began after an "injury in which she apparently tripped on a rubber mat at a local restaurant [Senor Pepper's] in Farmington" in August 2005. [RP 172.]

During the August 8, 2007 administrative hearing, Griffith testified she was in good health before a fall in August 2005, that resulted in an injury to the sciatic nerve. [RP 305.] Griffith further testified she tripped and fell on a rolled up rug outside a casino door. [RP 323.] Based on the inconsistencies in the record, it is not clear how Griffith sustained her injuries, i.e., whether she was injured in a car accident, in a restaurant or outside a casino.

### 2005 Medical Records

Griffith's medical records begin on April 4, 2005, when she was seen by her primary care physician, Dr. Rousseau. [RP 141.] Griffith had had dental surgery for an abscess and was given pain medication. Dr. Rouseau noted on the medical record "no smoking" and "no more narcotics." [RP 141.]

August 15, 2005 is supposedly the onset date for Griffith's disability based on a car accident that occurred on that date. However, nothing in the medical record confirms that Griffith sustained such an accident on August 15 or that she received treatment related to a car accident then.

---

[10]Synovia is defined as a transparent alkaline viscid fluid secreted by the synovial membrane, and contained in joint cavities, bursae, and tendon sheaths. Dorland's Illustrated Medical Dictionary, 31st Ed. (2007).

[11]Subluxation is defined as an incomplete or partial dislocation. Also defined as a vertebral displacement believed to impair nerve function. Dorland's Illustrated Medical Dictionary, 31st Ed. (2007).

On September 12, 2005, Dr. Rousseau treated Griffith after she had fallen and hurt her lower back at a casino. Griffith complained of numbness in her left arm. She had significant redness and muscle spasms in her lower back. On October 13, 2005, Griffith complained that her back was worse. [RP 139.] An x-ray of the lumbar spine showed normal alignment of the vertebral bodies with no significant disc space narrowing. There was mild intervertebral osteophytes[12] at multiple levels and mild facet sclerosis. Griffith suffered from mild degenerative changes at the SI joints and hips. In summary, the overall diagnosis was mild degenerative changes in the lumbar spine, SI joints and hips. [RP 140.] On October 24, 2005, Griffith reported to Dr. Rousseau that she still felt pain radiating down her leg. She was scheduled for an MRI in November. [RP 139.]

The November 2, 2005 MRI indicated no impingement at L5-S1 but facet and flavum hypertrophy. The disc was narrowed at L4-5 and there was slight anterior subluxation. A posterior central disk bulge was noted along with a right synovial cyst. Griffith had moderate to severe central canal stenosis. [RP 138.] On November 7, 2005, Dr. Rousseau prescribed 800 mg of Ibuprofen and referred Griffith to a neurosurgeon. [RP 137.] On November 6, 2005, Griffith complained that her back pain was worse and she suffered from numbness and tingling, primarily in her right leg and foot. She had muscle spasms in her arms. Dr. Rousseau prescribed Soma[13] and Ibuprofen. [RP 136.]

On December 30, 2005, Griffith applied for SSI and DIB. [RP 70.] At a face-to-face interview, disability services reported Griffith exhibited problems with coherency, concentration,

---

[12] A bony excrescence or osseous outgrowth. Dorland's Illustrated Medical Dictionary, 31st Ed. (2007).

[13] Soma "is used to treat pain and discomfort from muscle injuries such as strains, sprains, and spasms. It is usually used along with rest, physical therapy, and other treatments (e.g., anti-inflammatory medication). Carisoprodol is called a centrally acting muscle relaxant. It works on the nerves to relieve muscle pain. It may also relieve pain by calming your nervous system." www.webmd.com

and answering questions.  She also had problems walking, sitting and standing. [RP 70-74.]  She said she was in so much pain she could not concentrate or give accurate information.  She made moaning sounds during the interview.  Griffith used a cane and walked "hunched over at a very slow pace."  She shifted frequently in her chair. [RP 74.] Nothing in the medical record indicates the cane was prescribed.

In her disability report, Griffith stated severe sciatic nerve problems limited her ability to work.  She had been in a car accident in August 2005.  She was taking Tramadol[14] for pain that made her feel drowsy and dizzy. [RP 76-80.]

In a December 30, 2005 disability report form, Griffith stated that she lived with her son.  She tried to walk to all of her appointments but her pain was never-ending.  She tried to clean house but she could barely bathe herself.  She was able to take care of her son and ensure that he ate.  Griffith could walk, sit, and stand but not for long.  She felt pain at night and her hands and feet became numb.  Her son and his friends fixed her meals.  She reported that she was unable to get a job and that her son, who suffered from seizures, was suddenly cut off from SSI benefits. [RP 94.]  Griffith read, worked crossword puzzles and watched television.  She no longer could ride a bike, go dancing or play bingo. [RP 95.] When asked what activities were affected and what parts of her body were in pain, Griffith checked off every box on the form.  She was using a cane to walk and a wheelchair to shop. [RP 90-97.]

### *2006 Medical Records*

On January 5, 2006, Dr. Rousseau noted Griffith had a knot on her left arm and that she still complained of back pain and muscle spasms.  Griffith again was prescribed Soma and Ibuprofen.

---

[14]"This medication is used to relieve moderate pain. It is similar to narcotic pain medications. It works on certain nerves in the brain that control how you experience pain."  www.webmd.com

[RP 136.] On January 16, 2006, Dr. Flitter, a neurologist, examined Griffith. He noted that she had not had any physical therapy or epidural injections since her back problems began on "January 20, 2005." [RP 142.] Dr. Flitter reviewed the MRI findings from November and stated that her history was otherwise benign. Griffith was tender at L4-5, and the straight leg raises produced pain at 45 degrees. She had hypalgesia[15] at L5-S1 on the right side. Griffith was able to toe/heel walk. There were no range of motion limitations with her back. Dr. Flitter recommended physical therapy and epidural injections. If Griffith's symptoms continued to bother her after treatment, Dr. Flitter would offer decompressive surgery. [RP 142.]

On January 25, 2006, Griffith went to Healthsouth for physical therapy. She had difficulty dressing because of pain. She was able to sit comfortably for only 15 minutes. She reported having had lower back pain with right leg radiculopathy when she fell at the end of September 2005. On January 25th, Griffith was walking with a cane and stated she wore a back brace. [RP 158, 240.] The physical therapist evaluating Griffith found that her rehabilitation potential was good. The clinical findings were consistent with spinal disorders. She presented with a four-month history of lower back pain and had a cyst in her back. The therapist observed that Griffith walked with a moderately antalgic gait while using a cane. [RP 156.] On January 26, 2006, Dr. Rousseau refilled prescriptions for Soma, Ultram[16] and Motrin. [RP 219.] On January 30, 2006, Griffith reported to her therapist that she felt good when not on her feet but that the pain returned when she stood up. [RP 154, 236.]

On February 1, 2006, Griffith cancelled her physical therapy appointment due to illness. [RP 153, 235.] On February 3, 2006, she began to feel a "burning and pulling pain" in her lower back

---

[15]Decreased sensation to pain. Dorland's Illustrated Medical Dictionary, 31st Ed. (2007).

[16]Ultram is the brand name for Tramadol. www.webmd.com

with manual therapy to the right hip. [RP 151, 234.] On February 6, 2006, the therapist emphasized lower back strengthening.  Griffith reported she was sore but felt a little better at the end of the treatment. [RP 149, 232.] On February 8, 2006, Griffith did not perform certain exercises.  Her pain had decreased over the past few days. [RP 147, 148, 230.] On February 10 and 13, Griffith did not show up for her therapy appointments or cancelled. [RP 145, 146.] On February 28, 2006, she was discharged from physical therapy.  The therapy records state that her insurance was terminated on February 1, 2006 due to insurance limits on treatment. [RP 143, 225.] The discharge summary provides a diagnosis of spine; lumbar disc displacement with mild restrictions.  She exhibited an abnormal gait pattern

On April 6, 2006, Dr. Werner provided a physical RFC assessment.  The primary diagnosis was a herniated disc at L4-5.  Dr. Werner determined that Griffith could lift up to 20 pounds occasionally and 10 pounds frequently; could stand, sit, or walk six hours and was unlimited in her ability to push or pull.  She had severe sciatica nerve and back problems.  The medical record indicates that Griffith had slipped while leaving a restaurant in January 2005 and had suffered radiating back pain from that date forward.  She reported that she had not had physical therapy or epidurals.  The synovial cyst on the right side of her back was associated with a herniated disc. Griffith was currently taking Tramadol and Ibuprofen.  Dr. Werner concluded Griffith had improved since the onset date and was expected to continue to improve with treatment.  She should be able to perform light work by August 2006. [RP 162-64.]

On April 7, 2006, disability services denied her application for benefits. [RP 47, 59.]

On April 14, 2006, Griffith was seen at Presbyterian ("PMS").  She complained of pain and injuring a nerve seven months earlier.  She reported a cyst was growing on a nerve and that pain was affecting her right leg and sometimes her left leg. [RP 171.] Griffith was using a cane. [RP 171.]

On April 25, 2006, Griffith, acting *pro se*, requested reconsideration of disability services' denial.  She wrote that she was disabled and could not work. [RP 57.]

On May 8, 2006, Griffith filled out another adult function report. [RP 121.] She lived at home with her son.  She was able to dress but only with great difficulty.  Griffith read books, watched television and made sure her son ate and went to school.  She also helped her son with homework.  She was unable to do yard work, bicycle, work, walk or clean.  Her sleep was interrupted because of pain.  She suffered acute spasms of pain.  She could neither stand nor sit for long and could not think clearly due to pain. [RP 122.] Griffith was still able to drive some and tried to visit friends.  She shopped only if necessary, but by using a motorized cart.  She was able to walk only 40-50 feet before stopping.  Her hearing was worse and she suffered from ringing in the ears. She could not climb stairs, had blurred vision and short memory, and it took her longer to complete a task. [RP 121-28.]

On June 16, 2006, Dr. Barkman, in Aztec, New Mexico, performed a physical examination of Griffith at the request of disability services. [RP 172.] Griffith's main complaint was lower back pain that radiated pain and numbness into her buttocks, both thighs (although the right side was worse), and her legs.  She felt numbness and tingling in her legs occasionally.  She explained to Dr. Barkman that she tripped on a rubber mat at a local restaurant and fell, causing the original lower back pain and radiating symptoms.  Dr. Rousseau had prescribed Soma and Ibuprofen but she was not taking any medications at this time. [RP 172.] She was a smoker but did not drink alcohol. Griffith attended school for 11½ years, according to this report. [RP 173.] She suffered from occasional headaches but had no recent visual or hearing loss (in contrast with her reports on May 8, 2006).

Upon examination, Dr. Barkman noted normal range of motion in Griffith's neck. [RP 173.] The muscle bulk in her upper extremities was symmetric.  The grip strength in both hands was normal.  There was no evidence of pedal edema.  She exhibited full range of motion as to her hips, knees and ankles.  Griffith "stood down" from the exam table "pretty easily."  No particular deformity was observed in her back and no spasms occurred.  She was able to "forward flex." Griffith used a cane for ambulation.  Dr. Barkman thought she might have lumbar myelopathy.  The neurological, motor and reflex findings were normal.  However, her symptoms were suggestive of lumbar myelopathy[17] or radiculopathy.  Her right side pain was more pronounced than the left. [RP 174.]

On June 21, 2006, disability services requested medical advice to determine if a cane was medically necessary.  They ordered a consultative exam. [RP 176.]  In July 2006, disability services notes indicate that Dr. Kandos did not believe the cane was medically necessary.

On August 11, 2006, disability services denied the request for reconsideration. [RP 46, 54, 275.] Her pain was not expected to be severe enough for twelve months to prevent her from working. [RP 275.]

On October 23, 2006, Griffith requested a hearing by an ALJ.  She argued that the most vital medical records had not been reviewed or investigated.  She further asserted that x-rays were undisputable evidence of a disabling condition.  Griffith was not represented by counsel. [RP 52.]

---

[17]Any of various functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis.  Dorland's Illustrated Medical Dictionary, 31st Ed. (2007).

14

### *2007 Medical Records*

On January 20, 2007, it appears that Griffith again started physical therapy at Healthsouth. [RP 189.]

An April 5, 2007 medical record indicates that Dr. Rousseau continued to manage Griffith's medications.  She was prescribed Soma and Motrin and referred again to Dr. Flitter. [RP 218.]

On May 10, 2007, an MRI of the lumbar spine showed a narrowed disc at L5-S1, disc protrusion and hypertrophy.  There was also a broad based posterior disc bulge with an annular tear. The testing indicated severe central stenosis and degenerative disc disease.  Griffith also suffered from facet osteoarthritis with spinal stenosis. [RP 217.]

On May 22, 2007, Dr. Rousseau saw Griffith for back pain and disc disease and medical management.  She referred Griffith to physical therapy and to Dr. Flitter. [RP 215.]

On May 24, 2007, Griffith presented to Healthsouth for therapy, with a chronic history of lower back pain and a diagnosis of L5-S1 disc replacement.  She suffered from occasional left leg numbness.  Her range of motion was decreased and painful. [RP 209, 212, 265-68.] She reported she was initially injured when she tripped over a rug. [RP 287.]

On May 30, 2007, the therapy notes indicate Griffith was very stiff and tender but had some relief from the treatment. [RP 207.] On June 1, Healthsouth added exercises for lower back and pelvic stability.  Griffith complained of moderate pain to the left sacrum. [RP 205.] Griffith did not show up for an appointment on June 6.  On June 7, the treatment to her lower back and sacrum was reported as "very tender."  Griffith had not done therapy for a week. [RP 202, 204.] On June 8, Griffith cancelled her physical therapy appointment. [RP 201.] On June 13, 2007, she reported that the sacral region caused a burning sensation and was tender initially.  She felt some relief from the therapy. [RP 199.] On June 14, 2007, her lower back was very tender on the left but the tension

15

decreased.  There was no pain with exercises for core strength. [RP 197.] On June 15, Griffith cancelled her therapy because of symptom exacerbation. [RP 196.] On June 18, 2007, she felt better with the pelvic alignment. [RP 194.] On June 20, 2007, Healthsouth records indicate Griffith felt 50% improvement overall.  She continued to have severe pain when standing up or lying down.  There was no change reported in Griffith's subjective complaints.  Her lumbar spine was improved but continued to be limited.  Her flexibility was slowly improving.  Griffith was frequently late for appointments. [RP 189.]

On June 25, 2007, Dr. Flitter wrote to Dr. Rousseau.  Griffith persisted with "intractable back pain" from which she suffered for two years with pain radiating into both extremities. [RP 220.] She benefitted some from physical therapy but not enough to live without discomfort.  Dr. Flitter reviewed the MRI studies with Griffith, who was reluctant to pursue pain treatment at the pain clinic, including epidural and facet injections and facet rhizolyisi.[18]  She was, however, interested in surgery.  Dr. Flitter reviewed "in length decompression and fusion from L4 to S1."  Straight leg raises produced pain in the back at 45 degrees on the left side.  She was able to heel/toe walk.  Dr. Flitter planned to schedule Griffith for surgery. [RP 220.] On August 7, 2007, Griffith reported to Dr. Rousseau that she would have surgery in the next month. [RP 215.]

On August 7, 2007, an ALJ hearing was started in Farmington, New Mexico.  However, because Griffith was not represented by an attorney and wanted counsel, the hearing was re-scheduled. [RP 297.]

On August 24, 2007, Healthsouth discharged Griffith from physical therapy.  She had not returned for further treatment and did not return follow-up telephone calls. [RP 187.]

---

[18]Rhizotomy is defined as an interruption of a cranial or spinal nerve root.  Dorland's Illustrated Medical Dictionary, 31st Ed. (2007).

On October 1, 2007, Dr. Rousseau refilled prescriptions for Soma and Ibuprofen. [RP 214.]

On November 27, 2007, the re-scheduled ALJ hearing in Farmington proceeded.  Griffith appeared with counsel. [RP 301, 303.] She stated she had a high school education and was divorced. She worked as a phlebotomist for eleven years until her back problems started in August 2005. [RP 305.] When Griffith previously fell, she was told that her sciatic nerve was torn.  Griffith described her physical therapy and medications prescribed by Dr. Rousseau.  Surgery was recommended and she was leaning towards having it but it was not yet scheduled. [RP 307.] Dr. Rousseau recommended she try another series of physical therapy treatments and Griffith planned to start them the next day. [RP 307.]

Rousseau described the pain as "never going away."  She had some good days, but the pain was always present.  Pain radiated down the left leg to the front of the leg and sometimes down her arm and entire body. [RP 308.] She used a cane as recommended by a physical therapist and Dr. Rousseau (although it is not noted in Dr. Rousseau's records).  She used the cane when wearing heels.  Yesterday, while walking without heels, she did not use a cane. [RP 309.] The worst part of the day for Griffith was the morning.  It took her 15 minutes to get out of bed due to pain.

Griffith was able to perform some "side work" but made only $500-$700 a month.  She went to the casino once a week but did not stay long because of pain.  However, she tended to have luck and always left the casino when she "was ahead." [RP 311.] She stayed about an hour at the casino but could not sit or stand too long.

Griffith asked the ALJ if she could stand up off and on during the hearing because of the radiating pain. [RP 314.] She said she could drive sometimes to sales if she received a "good tip." She then re-sold items to try to make a profit.  She was also able to crochet but could not do that for

long because her hands became numb. [RP 315.] She was unable to sleep at night because of pain. [RP 316.]

Griffith testified that when the surgery was completed, she expected to get well and return to work. [RP 317.] She also testified that her injury occurred when she fell outside a casino in 2005. [RP 323.]

A vocational expert testified at the ALJ hearing. [RP 320.] The VE noted that Griffith worked as a phlebotomist which was light, semi-skilled work.  The VE concluded that Griffith's PRW was precluded by her limitations with "posturals."  The ALJ asked the VE if there were any jobs for someone with a high school diploma, who could do light work with occasional postural limitations.  The VE testified that she would be able to perform the jobs of a courier, parking attendant and shipping and receiving weigher. [RP 326.] If, however, Griffith had moderate limitations in the ability to concentrate, secondary to pain, she would not be able to maintain a job for more than 3-4 months.

On February 20, 2008, the ALJ issued a written decision denying Griffith's requests for benefits. [RP 15-22.] The ALJ found that Griffith had the RFC to lift and carry 10 pounds frequently and 20 pounds occasionally.  She could sit, stand or walk up to six hours a day and could engage in a range of postural movements occasionally, with only slight limitations.  In evaluating Griffith's subjective complaints of pain, the ALJ indicated that he reviewed the record, Griffith's credibility, her daily activities, medication, and treatment.  The ALJ found that Griffith was not entirely credible. [RP 19-20.] Ultimately, the ALJ found Griffith not disabled.

On March 31, 2008, Griffith filed a request for review.  She stated she could not work now and had not been able to work due to an injury. [RP 11.]

18

On August 22, 2008, the Appeals Council denied the request for review.  The Appeals Council mistakenly reviewed correspondence from an unrelated applicant, but also reviewed a letter from Griffith's attorney, dated April 11, 2008. [RP 5-9.]

## V.   **DISCUSSION**

Griffith first argues that the Appeals Council improperly relied on evidence from another claimant, which is indicative of the Appeals Council's "cursory nature of the examination at that level of administrative review." [Doc. 15, p. 3.] Griffith asks the Court to strike the improper letter from the other benefit applicant and the Appeals Council's reasoning that relates to that letter.  The Court ignores the reasoning relied on by the Appeals Council in reviewing and discussing the wrong applicant's letter.  In addition, the Court concludes that the Appeals Council denied the request for review.  Thus, the ALJ's February 20, 2008 decision is the final decision in this case.

Griffith argues the reversal or remand is warranted because the ALJ's RFC finding was incomplete and unsupported by substantial evidence, the ALJ's hypothetical question to the VE did not include specific nonexertional limitations, the ALJ's credibility determination was contrary to the evidence, and the ALJ failed to consider the number of jobs available regionally.  [Doc. 15.]

Defendant contends that the Commissioner's finding that Griffith was not disabled was consistent with regulatory criteria and that substantial evidence supported the ALJ's decision. [Doc. 26.]

### **RFC Determination**

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuous basis – that is, eight hours a day for five days a week, or an equivalent work schedule.  "The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or

combination of impairments, including the impact of any related symptoms. " S.S.R. 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  The RFC is not the least an individual can do despite her limitations or restrictions, but the most.  20 C.F..R. § 404.1545 (2006).

The ALJ is entrusted with the determination of a claimant's RFC and such determination must be based on all of the evidence in the record.  20 C.F.R. § 404.1546; Corber v. Massanari, 20 F. App'x 816, 2001 WL 1203004 at *5 (10th Cir. Oct. 11, 2001).  The ALJ must evaluate a claimant's physical and mental RFC (where applicable), determine the physical and mental demands of the claimant's past relevant work, and finally decide if the claimant is able to meet the job demands despite any physical or mental limitations.  Doyal, 331 F.3d at 760.

"The ALJ should assess RFC once, in detail, at step four. . . . The ALJ must make specific findings as to RFC, Winfrey [v. Chater], 92 F.3d [1017], 1023 [10th Cir. 1996], and these findings must be supported by substantial evidence. . . ."  Adkins v. Barnhart, 80 F. App'x 44, 48, 2003 WL 22413920 (10th Cir. Oct. 23, 2003) (internal citations omitted).  SSR 96-8p requires that the ALJ's RFC assessment be based on all of the relevant evidence in the case, including medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, medical source statements, and the effects of symptoms, including pain, that are reasonably attributed to the claimant's medically determinable impairments.

Here, the ALJ properly made his determination of Griffith's RFC at step four.  He noted that he had considered the entire record and concluded Griffith could lift and carry 10 pounds frequently and 20 pounds occasionally; sit, walk or stand for six hours; push or pull without limits; and engage in a full range of postural movements occasionally except for climbing ropes, ladders or scaffolds. The ALJ also found Griffith could manipulate, see and communicate without restriction and work within any environment. [RP 18.]

20

In making the RFC determination, the ALJ explained that he considered all of the symptoms that could be accepted as consistent with objective medical evidence. He also considered "opinion evidence," without specifically noting what opinion evidence he found persuasive. The ALJ properly noted the types of objective medical evidence he could consider, including daily activities, location, duration, and frequency of Griffith's pain, factors that precipitate the symptoms, type, dosage effectiveness of medications, other treatment and Griffith's subjective complaints. [RP 18-19.]

The Court concludes that substantial evidence does not support the ALJ's RFC determination, in part, because it is unclear what "opinion evidence" the ALJ relied upon in reaching his RFC assessment. The ALJ appears to have relied on a non-examining physician's RFC physical assessment. On April 6, 2006, Dr. Werner performed a physical RFC assessment. The assessment did not include a physical exam but consisted of a record review. Dr. Werner checked off restrictions based on his review of the medical record up to that date. The ALJ's list of restrictions mirrors those of Dr. Werner's 2006 assessment.

However, no examining physician provided opinion evidence as to Griffith's limitations. Griffith was referred to Dr. Barkman for a consultative exam in June 2006, but Dr. Barkman did not offer any opinion as to Griffith's possible functional limitations. He did not specify whether she did or did not have limitations. The only medical professional to offer an opinion as to limitations was the non-examining physician.[19] [RP 162-69.] Similar to the facts in Adkins, no examining medical

---

[19]Respondent argues that Dr. Janice Kando, a state agency physician, "gave a functional assessment as she opined on July 6, 2006 that Plaintiff could [perform] a restricted range of light work activity." [Doc. 16, p. 6.] Dr. Kando's name appears for the first time on an undated "request for medical advice" form. The note on this form indicates that a disabilities services employee "discussed this claim with the SAMC on call - Dr. Kando." The form further states disability services ordered a consultative exam for Griffith because she could not obtain treatment due to cessation of insurance. The form explains that the exam was received and the claimant "seems able to function." The person filling out the form states that she/he could not determine if the cane was medically necessary. "Please

professional described Griffith's physical capabilities for walking, standing, or sitting.  *See* Adkins, 80 F. App'x at 47 (claimant's testimony and a checkmark-style RFC assessment were insufficient to provide substantial evidence in case where ALJ conclusively relied on grids).

The ALJ clearly relied on Dr. Barkman's June 2006 report and examination of Griffith. However, the ALJ's summary of Dr. Barkman's report emphasizes those findings that might be viewed as normal or negative.  For example, the ALJ relied on Dr. Barkman's observation that Griffith took no pain medications in June 2006.

The ALJ failed to note that one explanation for Griffith's failure to continue with physical therapy was because she had lost her insurance as of that date.  This could reasonably explain why she was not taking prescription medications.  Further, Dr. Barkman found that Griffith had lower back pain with radiating symptoms into the lower extremities that might "well represent a lumbar myelopathy."  Dr. Barkman stated that Griffith's history "is certainly suggestive of a lumbar myelopathy or radiculopathy.  The right side certainly is more pronounced that the left . . . ." [RP 174.]  While the ALJ discusses some of Dr. Barkman's report, there is little to no discussion of Dr. Barkman's findings that supported some of Griffith's complaints.  Moreover, the ALJ failed to explain why he rejected those parts of Dr. Barkman's report that confirmed Griffith's complaints of pain and her lower back problems.

In addition, the ALJ discusses those parts of Griffith's May 2006 adult function report that show daily activities she could perform.  For example, the ALJ's decision indicates that Griffith felt

---

advise."  Another disability form shows that Dr. Kando wrote she did not believe the cane was medically necessary and that the April 2006 RFC (by Dr. Werner) should be affirmed. [RP 177-178.] Contrary to Respondent's position, it does not appear that Dr. Kando "gave a functional assessment."  Instead, she merely affirmed the findings of a non-examining physician.  The Court does not find that Dr. Kando's brief notations constitute substantial evidence to support the RFC findings.  Moreover, while Respondent argues that the ALJ relied on Dr. Kando's opinion before determining Plaintiff's RFC [Doc. 16, p. 6], the ALJ's decision does not specifically reference Dr. Kando's notations or Dr. Werner's assessment. [RP 18-20.]

some pain and limitations but still could fix simple meals for herself and her child, could take care of finances, did light household chores, drove, shopped, helped her son with homework, visited others, and attended church occasionally. [RP 20.] What he does not say is that Griffith reported she felt sharp pain, that pain make it difficult to sleep, that she had so much pain it was difficult to dress, and that she suffered from "acute spasms." Griffith could not stand or sit too long and could not think clearly due to pain. [RP 122.] The pain was worse with every move she made. She tried to visit friends and drove only when necessary. When she shopped, she used a motorized cart. Her level of concentration was affected by pain.

Just as an ALJ cannot "pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability," Robinson v. Barnhart, 366 F.3d 1078, 1083 (10th Cir. 2004), an ALJ cannot select only those portions of the administrative record that support his conclusion while ignoring contradictory reports. This is true here where Griffith's subjective reports of pain are supported by the objective medical evidence.

The Court also determines that substantial evidence does not support the ALJ's RFC determination because the ALJ failed to explain why he discounted or rejected findings and recommendations in the most recent medical reports from 2007. In May 2007, Griffith again was evaluated by Dr. Flitter. By this time, Griffith again was using pain medication as prescribed.[20] Dr. Flitter noted that Griffith "persists with intractable back pain that she has now for two years with pain radiating into both lower extremities, the right somewhat greater than the left. She has benefitted somewhat from physical therapy, but not sufficiently that she feels she could live with the amount of discomfort she has." [RP 220.] Dr. Flitter believed that simple decompression surgery

---

[20]At the ALJ hearing, Griffith testified she was taking prescription medications for pain. [RP 305-06.]

would not be adequate based on Griffith's spondylolisthesis and the ongoing generation of pain from her facet disease.  Dr. Flitter concluded that he would schedule Griffith for back fusion surgery.  At the ALJ hearing, Griffith testified that the pain never went away and that surgery had been recommended. [RP 307, 308.] The ALJ did not explain why he rejected Dr. Flitter's conclusion to recommend surgery based on Griffith's condition.  Indeed, the ALJ made no mention of surgery in the written decision.

Additionally, there is no mention of a recent May 2007 MRI indicating disc protrusion and hypertrophy.  That testing indicated "severe central stenosis and degenerative disc disease." [RP 217.] The ALJ did not discuss the 2007 MRI, and instead, referred to an earlier MRI.

The ALJ also did not mention the 2007 physical therapy records[21] or explain why the physical therapy records should be rejected.  Those records indicate that Griffith attempted to follow prescribed treatment.  Moreover, the PT records consistently document Griffith's complaints of stiffness, tenderness, lower back pain and numbness.  [*See, e.g.,* RP 187, 189, 199, 202, 207, 209.] On June 20, 2007, the physical therapist wrote that Griffith continued to have severe pain when getting up or lying down.  Her range of movement was somewhat improved but still limited. [RP 189, 245, 291.]

For the above-stated reasons, the Court remands for an additional administrative hearing so that the ALJ can document the evidentiary support for his RFC determination.  In so doing, the ALJ may consider whether to have the consultative examining physician or the primary care physician perform a functional assessment.  However, the Court disagrees with Griffith that it was error for

---

[21]While Griffith's attorney states in a letter to the Appeals Council on 4/11/08 that he is attaching additional evidence, consisting of the 2007 physical therapy records, these records were duplicates of physical therapy documents already part of the administrative record.  Thus, it appears the ALJ had those records to review in reaching his decision. [RP 189, 202, 205, 209, 261, 265-68, 245, 283, 291.]

the ALJ not to require a functional assessment.  The pertinent regulations provide that while a consultative examination usually includes a medical source statement about what the claimant can still do despite any impairments, "the absence of such a statement . . . will not make the report incomplete.  20 C.F.R. § 404.1519n(c)(6).  Thus, the absence of a functional assessment is not an error, but in this case, might prove helpful to the RFC determination.[22]

In addition, upon remand, the ALJ should determine the credibility of pain testimony in accordance with Luna v. Bowen, 834 F.2d 161, 163-64 (10th Cir.1987).  In other words, the ALJ should not merely list the pertinent factors as he did his February 2008 decision, (*e.g.,* the levels of medication and their effectiveness, the extensiveness of attempts (medical or non-medical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, and the consistency or compatibility of non-medical testimony with objective medical evidence), he should provide specific discussion of the relevant factors.

Because the Court remands for the reasons discussed above, it does not address additional arguments for remand by Plaintiff.

---

[22]The decision to remand is no indication of whether Griffith is entitled to benefits.  Like the ALJ, the Court is concerned with multiple inconsistencies in Griffith's testimony and in the records as noted, as well as other factors.  For example, Griffith had the money to support her "pack-a-day" smoking habit and to go gambling on a frequent basis when she apparently could not afford medical prescriptions for her pain.  She complained that she could not sit long and that she could only drive when necessary but testified at the ALJ hearing she regularly went to the casino and stayed for an hour.

## VI.  **<u>RECOMMENDATION</u>**

For all of the above-stated reasons, the Court determines that Griffith's Motion to Reverse or Remand is GRANTED and that this matter is remanded for additional administrative proceedings in accordance with this decision.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge